# Timothy Peaceable, lessee of John Ross and John Vaughan, *against* John Eason and Robert Eason.

A special verdict must find the facts distinctly ; but on a demurrer to evidence, the evidence only is stated, yet if it be by parol, and the effect of it be doubtful, all the facts which the evidence tended to prove, or which the jury might infer from it, are thereby admitted. The party may insist at the trial that his adversary, demurring, shall confess such facts on record : But if this is not done, the court will consider everything as admitted, which the judge who tried the cause would have done, in order to compel a joinder in demurrer.

A special license to survey lands cannot be retracted ; and though the purchase money is not paid or tendered, it will not invalidate the grant.

EJECTMENT for lands in Northumberland county.

The cause was tried at Sunbury, on the 17th October 1796, when the plaintiff's counsel demurred to the evidence given by the defendants.

The record was as follows :

*55]      "* Afterwards, to wit, on the day, and at the place within "in contained, before the Honorable† JASPER YEATES, "esq. and the Honorable THOMAS SMITH, esq., two of the judges "of the Supreme Court of Pennsylvania, came as well the with- "in named Timothy Peaceable, by Charles Smith his attorney, "as the within named John Eason and Robert Eason by Thomas

* No writ of error or appeal shall have effect, unless brought within seven years, &c. By act of assembly of 13th April 1791. 3 Dall. St. Laws 99.

† YEATES J. was originally of counsel for the plaintiff, and took no part in the cause when a new trial was awarded in April term 1791, or in any subsequent stage of the suit.

" Duncan, their attorney ; and the jurors of the jury, whereof
" mention is within made, that is to say, Peter Furst, &c. being
" called likewise came, and were chosen, tried, and sworn, to say
" the truth of the premises within contained ; and the said Tim-
" othy Peaceable to prove his right, produced in evidence the
" following matters of record :

" 1. An application of colonel Turbutt Francis, dated 3d
" February 1769, in behalf of himself, and the other officers of
" the 1st and 2d battalions of the Pennsylvania regiment, for
" 24,000 acres of land, to be seated, and divided amongst them,
" according to their agreement among themselves, and the con-
" cession of the proprietaries.

" 2. The order of governor John Penn and the Board of Pro-
" perty thereon, dated the said 3d February 1769, agreeing to
" the application, except that colonel Clayton should have no
" share thereof, and that the said 24,000 acres should be taken
" up in bodies of 8000 acres each.

" 3. A survey of 246 acres and allowance, made for Jacob
" Kern, on the 24th May 1769, on the west branch of Susque-
" hannah, then in Berks county.

" 4. A warrant of acceptance to Jacob Kern of the tract of
" 246 acres, reciting a division of the lands surveyed amongst
" the officers, and that this tract fell by lot to captain Kern,
" dated 9th May. 1774.

" 5. A patent to the said Jacob Kern for the premises, in con-
" sideration of 12l. 6s. sterling, dated 15th June 1774.

" 6. A deed from the said Jacob Kern for the premises, to John
" Witmer, in consideration of 650l., dated 8th August 1783.

" 7. A deed from John Witmer aforesaid and wife, and Ma-
" thias Slough, of the first part, John Witmer and Henry Wit-
" mer, of the second part, with special recitals therein, for the
" premises, to the aforesaid John Ross and John Vaughan, the
" lessors of the plaintiff, in consideration of 674l. 10s., dated
" 9th September 1785.

" Whereupon the said John Eason and Robert Eason shew
" *in evidence to the jury aforesaid, to prove and main-      [*56
" tain the issue within joined on their part, the following
" book, papers, records, and parol evidence, viz.

" 1. The book of minutes of the board of officers of the 1st
" and 2d battalions of the Pennsylvania regiment, kept by gen-
" eral James Irwin, who was duly appointed their secretary for
" that purpose, in *hæc verba.*"

[By this book, it appeared among other things, that on the
8th September 1764, the officers who served under colonel Fran-
cis, came to an agreement to make application for a special order
to take up lands, in consideration of their services during the
war, and subscribed certain sums for that purpose.

On the 28th March 1765, two officers were appointed com-
missioners to make application to the governor.

On the 28th June 1765, it was agreed, that the officers absent on duty should be included in the application, excluding those who had refused to sign at Bedford on the 8th September 1764; and the amount of an ensign's subscription was fixed at 4l.

On the 21st January 1769, colonel Francis made report to the officers of the governor's terms, upon the application made to him, which the officers accepted on the 26th January, and the written terms were fixed by the order of the governor and Board of Property on the 3d February following, as before stated.

Surveys were made thereon in March and April, of lands in the forks of Susquehannah, and on Bald Eagle creek, and in Buffaloe Valley, but there remained a deficiency of 419 acres to complete the proportions of all the officers. The allotment of each ensign, of the lands surveyed in the forks of Susquehannah and Buffaloe Valley, was 246⅔ acres, and on Bald Eagle was 216 acres. Ensign James Morrow (under whom the defendants held as tenants) was one of the officers, for whom the original application was made.

On the 16th May 1769, all the officers (except ensign Morrow) and the surveyors, met at Harris's ferry, to divide the lands surveyed, which they agreed to do by way of lottery. Previous to the drawing thereof, a letter from James Tilghman, esq. secretary of the Land Office, was read to the officers, wherein it stated, that ensign Morrow, having been charged with the rescue of one Stump, and a certain Ironcutter, who had been committed for the murder of certain friendly Indians on Middle Creek, from the gaol of Cumberland county, the governor had ordered that he should be excluded from any share in the lands, until the innocence of the crime should be ascertained.

*57]        *The officers agreed, that his share should remain suspended, until he should clear himself of the offence; but his lot was in the mean time drawn as well as the other officers, and he drew the lands in question.

One fifth of each officer's monthly pay was estimated as his share of the expences, and an ensign's proportion was fixed at 4l. It appeared a balance was carried out against Morrow of 3l. 4s.; and therefore 16s. must have been paid on his behalf.

The deficiency in the lands surveyed, being afterwards discovered, the officers wholly excluded ensign Morrow from any share, and the lands in question, marked No. 8, were assigned to captain Jacob Kern, on the 14th November 1772.

In the course of the same month, the accounts of the different officers, respecting the lands, were settled by persons appointed for that purpose, and finally closed.]

" 2 and 3. The application of colonel Francis, and the order " of the governor and Board of Property thereon, dated 3d Feb- " ruary 1769, before stated.

" 4. The field notes of a survey, made by William Scull, a

[Ross and Vaughan's Lessee *v.* Eason.]

" deputy surveyor, for ensign Morrow, of the lands in question,
" containing 246 acres and allowance, on the 24th May 1769.

" 5. A certificate of sundry surveys on Bald Eagle creek,
" whereby 216 acres, part of the larger survey, were allotted to
" ensign Morrow.

" 6. And they also proved by the oath of a certain Walter
" Clark, a juror on a former trial between the said parties, that
" a certain Reuben Haines, whose deposition was read on the
" said trial, but which is now lost, and the said Reuben Haines,
" is dead, did in the said deposition prove, that he attended a
" meeting of the board of officers of the 1st and 2d battalions of
" the Pennsylvania regiment, at the sign of the Indian Queen,
" in the city of Philadelphia, about the end of February or begin-
" ning of March 1774, as agent for and on behalf of ensign Mor-
" row, and that he tendered to the said Board of Officers, for,
" and on behalf of the said Morrow, the money for patenting the
" land in dispute, which was refused by the said officers. And
" also by the oath of a certain Thomas Hewit, that the said en-
" sign Morrow, rented the land in dispute, to the aforesaid John
" Eason, in 1772, and that the said Eason took possession of the
" land in consequence of the said agreement, and that he saw
" said Eason living on the land in a cabin, in 1773.

" And the said Timothy Peaceable saith, that the aforesaid
" matter to the jurors aforesaid, in form aforesaid, shewn in
" evidence by the said John Eason and Robert Eason, is not suf-
" ficient in law, to maintain the said issue within joined on the
" *part of the said John Eason and Robert Eason ; and [*58
" that he, the said Timothy Peaceable, to the matter afore-
" said, in form aforesaid, shewn in evidence, hath no necessity,
" nor is he obliged by the laws of the land to answer, and this he
" is ready to verify. Wherefore for want of sufficient matter in
" that behalf, shewn in evidence to the jury aforesaid, the said
" Timothy Peaceable prays judgment, and that the jury afore-
" said, may be discharged from giving any verdict on the said
" issue, and that his damages, by reason of the trespass and eject-
" ment within complained of, may be adjudged to him, &c.

" And the said John Eason and Robert Eason, for that they
" have shewn in evidence to the jury aforesaid, sufficient matter
" to maintain the issue on their part, and which they are ready
" to verify, and forasmuch as the said Timothy Peaceable doth
" not deny, nor in any manner answer the said matter, pray
" judgment, and that the said Timothy Peaceable may be barred
" from having his aforesaid action against them, and that the
" jury aforesaid may be discharged from giving their verdict
" upon the issue joined, &c. Wherefore let the jury aforesaid
" be discharged by the court here, by the assent of the parties,
" from giving any verdict thereupon," &c.

When the counsel for the plaintiff at the trial demurred to
the evidence, the counsel for the defendant contended, that he

was not obliged to join in demurrer, unless the plaintiff confess-ed by his demurrer, all matters of fact alledged by the defend-ant, and to which any evidence had been given, to be true; so that the question for the consideration of the court was, whether the evidence given was such as ought to be left to the jury.

And SMITH, J. declared, that the objection should be fully considered, on the argument of the demurrer, before the court in Bank.

The merits of the conflicting titles were fully argued on the demurrer to evidence, in Bank, on the 26th December 1797, by Messrs. E. Tilghman and C. Smith, for the plaintiff, and Messrs. Ingersoll, M'Kean and Duncan, for the defendants; and on the 22d March 1799, Mr. Ingersoll moved, that a *venire facias de novo* should issue, to ascertain with precision all the facts, out of which the law would arise. This motion was argued on the 24th March 1800.

Arguments for the defendants. This is a strong instance of an attempt to withdraw a question of fact from the cognizance of the jury, and transfer it to the court. By the 9th section of the 9th article of the state constitution, no one shall be deprived of his life, liberty or property, unless by the judgment of his *peers, or the law of the land. 3 Dall. St. Laws, Introd. 34. In King and Poole, Lord Chief Justice HARDWICKE lays down, that it is of the greatest consequence to the law and the subject, that the powers of the judge and jury are kept dis-tinct; that the judge determine the law, and the jury the fact; and if ever they come to be confounded, it will prove the con-fusion and destruction of the law. Annal. 28.

The demurrer only goes to compel a statement of the facts, and unless they are stated correctly, the defendants are not bound to join in demurrer.

A mass of evidence is spread on the record, from which the jury might constitutionally and justly have deduced the most material inferences, and which the court are prevented from doing. They cannot legally form any conjecture of the deduc-tions which the jury might have made, from all the evidence, both positive and presumptive. No fact is precisely stated to have been ascertained by proof, except the tender of the money to the Board of Officers, and the taking possession of the land, by en-sign Morrow. Whereas the jury might well collect from the field notes of Scull, that the survey had been made for Morrow on the 24th May 1769, by the assent of all his brother officers, notwithstanding what had passed at Harris's ferry, eight days before. The court cannot ascertain facts, which may arise from a variety of circumstances; they cannot infer a conversion, from a demand and refusal stated in evidence; nor from facts shewn in evidence, on a suit upon a policy of insurance, can they pro-nounce whether the vessel underwritten, was sea-worthy or not The counsel on the former argument, have drawn different con-

[Ross and Vaughan's Lessee v. Eason.]

clusions from the evidence, which forms part of the record.    The court are not competent to decide between them, as a jury may well do.    The minutes of the Board of Officers were read in evidence to supersede the attendance of the secretary, who otherwise must have proved the facts, *viva voce*.    The book therefore, must be considered in the mere light of oral testimony. From the facts contained in it, the jury might conclude, that ensign Morrow rendered services to the government, and was a meritorious officer; that he joined in the application, and was considered uniformly by his brother officers, as entitled to his proportion of the lands; and that he paid his quota of all expences, and his exclusion from the benefits of the grant was never considered as a serious act.                      .

The present case may be compared to Clark *v*. Russel in error in the Supreme Court of the United States, August term 1798. The record came before the court in so loose and imperfect a state, that they ordered a *venire facias de novo* to issue, as the deposition of William M'Whaun taken under a commission, *which was made part of the record, only stated a fact,     [*60 but not the inference deducible therefrom.    3 Dall. 415. There is a plain difference between facts ascertained, and evidence conducing to prove them.    The demurrer to evidence happens where doubts arise in law, concerning the legal consequences arising on facts.    3 Bla. Com. 373.    It is of no moment whether the defendant's counsel made their conclusions at the trial or not; they should have been called upon for that purpose. It is sufficient, that they objected in writing to the drawing up of the demurrer in its present form, and were promised every advantage which could be derived from their objections at the time, upon the hearing.    If even they intended to deceive the adverse counsel thereby, which cannot be pretended, the defendants ought not to be injured thereby.

The correct rule as to demurrers to evidence, is laid down in Tidd's Practice of B. R., Lon. ed. 582, 583.    Irish ed. 315, 316. The reason for obliging the party offering evidence to join in demurrer, does not apply to evidence of circumstances, or loose and indeterminate parol evidence.    In Gibson and Johnson *v*. Hunter, which was a demurrer to evidence carried by writ of error to the house of lords, Lord Chief Justice Eyre, delivered the unanimous opinion of the judges, that it is the province of the judge to decide, whether the evidence offered conduces to the proof of the fact to be ascertained; but the question, how far it conduces to prove the fact, belongs to the jury exclusively, to decide upon.    2 H. Bla. 205.    And after examining the cases of Middletown *v*. Baker in Cro. Eliz. 751, and 5 Co. 104, and Wright *v*. Pinnar in Aleyn 18, and Style 22, 34, he concludes, that on a demurrer to circumstantial evidence, the party offering the evidence is not obliged to join in demurrer, unless the party demurring will distinctly admit upon the record every fact and every conclusion, which the evidence offered conduces to prove

Ib. 209. A demurrer to evidence admits facts, which may be proved by presumptions and probabilities. Bull. 313. Every inference which the jury may draw from the evidence, is considered as admitted by the demurrer. It is like a special verdict. The jury alone can judge of the truth of facts, and the party cannot by a demurrer to evidence, or any other means, take that province from them, and draw such questions *ad aliud examen*. Doug. 127. 133. The party on a demurrer to evidence, cannot take advantage of any objection to the pleadings. Ib. 222.

Arguments for the plaintiff. The court are indebted for the present motion and debate, to the importation of 2 Hen. Blackstone's Reports into this country, since the first argument on the relative merits of the titles, on the 26th December 1797. The \*case of Gibson and Johnson *v*. Hunter certainly carries the law of demurrers to evidence beyond what were formerly the general received ideas ; because all the forms of demurrers in such cases to be found in the books, merely state the evidence. It will rest with the court to decide, whether the authority shall be adopted in this state, to its fullest extent. If it is so adopted, we contend, that the adverse counsel ought to have expressed their conclusions at the time of the trial. According to the grounds taken by EYRE, C. J. in 1 H. Bla. 208, the whole operation of conducting a demurrer to evidence, is under the direction and controul of the judge before whom the trial is had. It is obvious, that if this was not the case, there could be no demurrer to evidence where there was parol testimony, with any rational hopes of success ; because the counsel who adduced the testimony, might affect to infer the most inconsequential and unwarrantable matters therefrom, if the court would not interpose. There is no disguise, when we admit, that the same fears which operate on the defendant's counsel as to the court's decision of the law on the fact stated, alarm us as to the prejudices of a Northumberland county jury, pervading a determination of the law and fact blended together.

The facts here are not proved by presumptions or probabilities. The evidence is positive, clear and explicit, not loose and indeterminate. Parol evidence is sometimes certain, and no more admits of any variance than a matter in writing, which is the reason given in Co. El. 751, and 2 H. Bla. 206, why a party is obliged to join in demurrer, when the evidence which he offered is in writing.

In Sexton, lessee of Freeman, *v*. Boyle, Vern. and Scriv. 402, in the Exchequer Chamber of Ireland, the doctrine of demurrers to evidence seems to have received a full discussion, and the law thereon seems to be fully settled. It is in exact conformity to the cases already cited from Douglass. In the language of CARLETON, C. J. of C. B. a demurrer to evidence admits not only those facts which are directly sworn to and stated on record, but all conclusions of fact, to which the evidence is admissible, and

[Ross and Vaughan's Lessee *v.* Eason.]

to which it is properly relevant and applicable.  Ib. 454.  All the judges of the court of Exchequer agreed to the same doctrine, though Baron HAMILTON was opposed to overruling the demurrer.  Ib. 409.  The Chief Baron YELVERTON said, a difficulty had occurred to him during the argument.  He had considered, that when a fact is attempted to be proved by probability and presumption, and there is a demurrer to evidence, the party offering the evidence, ought to call on the other to admit it, before he joins in the demurrer ; but he had yielded to the opinion of his brethren, and had been helped out of the difficulty by the definition of a *demurrer to evidence, in Dougl. 114.  [*62 Every fact which the defendant's counsel asked for at the trial, was admitted ; the truth of all the facts sworn to, and all conclusions to which the evidence is properly relevant and admissible, are also admitted.  Neither the field notes of Scull, nor the minutes of the Board of Officers are capable of a variance ; they are in writing ; and the defendant's counsel have admitted, that the tender of the money and taking possession of the land are precisely stated as facts on the record.  The case of Clark *v.* Russel came before the Supreme Court of the United States, on a bill of exceptions.  The judgment of the Circuit Court was reversed, because the charge of the judge of the Circuit Court asserted, that the letters which were relied on as the written agreement, might be explained by parol testimony.  It was expressed as a general rule, without any qualifications or restrictions, and might have misled the jury.

The court continued the matter under advisement, and afterwards in September term, 1801, SHIPPEN, C. J. delivered the opinion of himself, and SMITH, J. as follows :

The difference between a cause coming before the court on a special verdict, and a demurrer to evidence, is that in the former case, the facts must be distinctly found by the jury ; but on a demurrer, the evidence only comes up : yet if the evidence be by parol, and any doubts arise as to the effect of the evidence, it shall be considered, that the party demurring had confessed all the facts, which such evidence tended to prove, or which the jury might fairly infer from the facts, in favour of the party offering the evidence.  It is true, that at the trial the party offering the evidence, may insist that the party demurring should confess upon the record the existence of the several facts, before he can be obliged to join in demurrer, yet if that be not done, and there be a joinder in demurrer, the case comes before the court above, upon the evidence only ; and that court will consider every thing as admitted, which the judge at Nisi Prius would have done, in order to compel a joinder in demurrer.  The difference in the two modes is only matter of form ; as the court above can as well judge, what ought to be considered as admitted by the demurrer, as the judge below, and will regulate their judgment accordingly And therefore the motion for a *venire facias de novo* is denied.

[Ross and Vaughan's Lessee *v.* Eason.]

At the importunity of the defendant's counsel, the court agreed to hear another argument upon the merits of the titles In the mean while, the book of minutes of the Board of Officers, which formed a part of the record, was lost : this occasioned considerable delay ; but it was afterwards agreed, that the loss should be supplied by the notes taken by the court and counsel, and the argument came on during the present March term, 1804.

*Arguments for the defendants.* The defendants as tenants of ensign Morrow, must be considered in the same situation, as if captain Jacob Kern had been the lessor of the plaintiff. The adverse possession of the land is held to be notice to a purchaser, who buys the premises, without personal knowledge of a trust. 2 Bla. Com. 337. It was a matter of notoriety ; and whatever is sufficient to put the party on an inquiry, is good notice in equity. 1 Atky. 490. Ambl. 313. 2 Fonbla. 155.

It appears by the evidence disclosed on the record, that the officers of the 1st and 2d battalions of the Pennsylvania regiment, meditated an application for lands in 1764, previous to the Indian purchase at Fort Stanwix, and subscribed certain sums for that purpose. Their services during the war were the alleged grounds of merit ; and in January 1769, the governor having signified his assent to their request, his terms were acceded to.

On the 3d February 1769, a grant was made to them by the Board of Property, in nature of a special warrant, of 24,000 acres, to be taken up in bodies of 8000 acres each, to be seated and divided amongst them, according to their agreement among themselves, with this single exception, that colonel Clayton should have no share thereof. He probably had given some offence to the government. But the name of ensign Morrow is found in the list of appliers, and he was included in the proprietary concessions. He is afterwards recognized as one of the parties entitled by his brother officers.

No conditions were annexed to the terms of the original contract, except seating of the land and payment of the purchase money. In every other particular it was complete and absolute, and did not depend on will or pleasure. Though the grant was general, it operated as to the three bodies of lands when surveyed, to make all who had joined in the measure, and were not excluded, tenants in common of the whole 24,000 acres, according to the proportions originally agreed upon, though the particular spots could not be defined. The division and allotment of the several tracts were to be made by the officers in a fair and equal manner ; but no power of excluding any individual was ever vested in them. This is analogous to the devise of lands to a number of persons, to be divided between them by A. and B., according to certain settled proportions ; it is clear, that in such a case, A. and B. could not, by their acts, divest the interests of any of the objects of the testator's bounty.

[Ross and Vaughan's Lessee v. Eason.]

*Previous to the meeting of the officers and surveyors at Harris's Ferry on the 16th May 1769, the lands had been surveyed in three bodies, in pursuance of the original grant. It cannot be denied, that at this time, the interest of ensign Morrow in his portion of the lands, as a tenant in common with his brother officers, became absolutely vested in him, and he could only be divested of it by some legal act. To the governor was reserved no right of revocation of his grant. The letter wrote by Mr. Secretary TILGHMAN, under his authority, was a mere nullity. To the officers of the two battalions, belonged no right of exclusion. If it turned out that there was a deficiency of 419 acres of the lands directed to be surveyed, it should have been borne by all the parties interested, in proportion to their several shares. But it is repugnant to every principle of justice, that one officer should be enriched at the expence of another. Property and crime are matters distinct in their nature. A man, against whom a criminal charge is whispered, does not forfeit thereby even an inchoate right. But if ensign Morrow had been convicted of the supposed rescue, he would not have forfeited his vested absolute right in the lands in question. The governor's direction was, that it should be excluded from his share, until his innocence should be ascertained. The officers gratified the governor by assenting to Morrow's share remaining in suspense, until he cleared himself of the charge; but his lots were drawn as well as the rest; and it appears by the evidence, that he obtained 216 acres of the larger survey made on the waters of Bald Eagle. After the alleged offence, the Board of Officers received 16s., which was paid on his behalf, as his quota of expences which had accrued; and the survey of the lands in question is marked on the field notes of William Scull, as having been really made for him. These things would not have happened, if the officers had credited the charge and really meant to exclude Morrow at the time. His exclusion would have been absolute; his lots would not be drawn, nor any money have been received on his behalf; the survey of these lands would not have been made for him, nor would he have been let into a share of the Bald Eagle lands. In fact, it was not until after the discovery of the deficiency of the 419 acres, that any serious injustice was meditated against Morrow by his brother officers. On the 14th November 1772, the land before allotted to him, was assigned to captain Kern.

Even admitting that the governor once thought unfavourably of ensign Morrow, and on that account would unreasonably refuse to ratify his original conceptions, and also adopting the preposterous position, that he retained some kind of controul over his grant, and might withhold a patent in his favour, we *have strong grounds to conclude that he changed his sentiments. Morrow could not demonstrate his inno- [*65 cence without a trial; and it was not to be expected that he would originate an indictment against himself for the supposed rescue. It does not appear that the government instituted any

prosecution against him, that any indictment was found, or that he absented himself, and proceedings of outlawry were carried on against him. He was not called upon by proclamation of the governor to surrender himself to justice. This might have been done, though the forfeiture could not be thereby increased. From these circumstances united, and the acts of the other officers recognizing his right, the jury might reasonably infer that the opinion of the administration as to the guilt of Morrow had undergone a thorough change. The evidence conduced to prove it; and it is within the principle of Gibson and Johnson v. Hunter, which was adopted by this court in their decision on the motion for a *venire facias de novo*, made in September term 1801. The demurrer to evidence is a bold measure, and puts everything to risque.

It is confidently apprehended that no strained construction has been made of the evidence, nor any unwarrantable conclusions deduced therefrom; that ensign Morrow became vested with a legal right to the premises in question, under the grant, allotment and survey, which he has never forfeited; that he has made a settlement on the lands, and tendered all monies due for his patent; and that he has a good title to the tract, whereof the plaintiff seeks the possession.

Arguments for the plaintiff. It cannot be denied that the lessors of the plaintiff have the complete legal paper title, and that the decision should be in their favor, unless an exclusive legal or equitable right to the tract of land, patented to Captain Jacob Kern, can be shown on the part of the defendants.

The meritorious services of the officers have been frequently sounded in our ears; but to whom were they rendered? Not to the late proprietaries. They were provincial troops, raised and paid by the then province. On the ground of right the officers had no pretensions. They well knew this and therefore applied for liberty to take up a large body of land by special license, before the office was opened, by way of favour and indulgence. The origin of their claim was neither warrant nor location, but a species of order different from the common mode of granting lands. Hence it would seem that the controul over this order remained in the governor and Board of Property, until the purchase money was paid and the settlements effected. At any rate, the lands were "to be divided amongst them and seated *66] "*according to their agreement among themselves, and "the concessions of the proprietaries to their petition." Sundry future acts were requisite in order to a confirmation; and with respect to ensign Morrow, these contingencies never happened. The confirmation of the proprietaries could not take place until the allotments were made by agreements among themselves. There was an express exception by the proprietaries against Morrow before their private lotteries were drawn, and before any appropriations were made, until he would sub-

mit to a trial and clear himself of an atrocious crime laid to his charge. Colonel Clayton had given some offence to the government and was refused any participation in the indulgence. Ensign Morrow had been charged with a breach of the laws, and had thereby given offence to every sober mind, and before any appropriation was made to him notice was given that he was to receive no favours. Every after act in his behalf was repugnant to the will of the lords of the fee. Widely different, perhaps, might the case have been, if before such exception the allotment had been fairly made, and the party was ready to comply with the terms. This special order was grounded on no other consideration than the good will of the proprietaries. No money was paid upon it. If confirmed it was valid, but its execution could not be compelled. The assertion that the jury might have concluded from the circumstances relied on, that the governor had changed his mind as to the guilt of Morrow, is wholly unfounded. It appears from the book of minutes that the governor adhered to his resolution to exclude Morrow on the 14th November 1772. The demurrer only admits facts which the jury might fairly deduce from the evidence ; and here positive evidence negatives that inference.

On the 16th May 1769, Secretary Tilghman's letter was read to the officers at Harris's Ferry before the lottery was drawn. It was not to be expected from them that they should oppose the wishes of the government, and induce a risque of their own title. They unanimously resolved that Morrow should have no share of the lands in question until he cleared himself of the offence ; but they allowed him a conditional chance in the lottery, and his property in the allotment to be made to him was declared to remain in suspense. He never submitted to a trial ; the governor adhered to his first determination, and Morrow was afterwards entirely excluded, and the land in dispute was allotted to Captain Kern, by agreement of all the officers. By their fundamental articles the board of officers were appointed their general agents in the division of the lands, and each individual agreed to be bound by their acts.

Kern unquestionably had an equal right to his proportion of *the lands with the other officers. If he had equal equity with Morrow, his legal right ought to prevail. It is of no [*67 moment as to the question before the court, whether the officers acted right or wrong in their division, but whether an allotment of this land was made to Morrow absolutely, to the prejudice of Kern. If no such allotment has been made, the former has only an undivided interest in the 24,000 acres, and not a right to any specified portion of the lands, even considering the original concessions as irrevocable. The warrant of acceptance, as well as the book of minutes, shews that this land was allotted to Kern, and that he had paid the consideration money is very clear. The

Board of Property therefore could only grant the patent to Kern, to whom the allotment was made.

Whether Morrow has a title to the 216 acres on the Bald Eagle, may come in discussion at a future day : but it is apprehended, that the tract marked in his name in the general survey, was drawn conditionally and to remain in suspense, equally with the tract now in dispute, though marked in the field notes of William Scull as surveyed for him ; and it is clear, that the deputy surveyors could make no appropriation of the surveys, unless by order of the officers in general, or the Board of Officers.

Another consideration appears to us to have weight. The purchase money under the original terms, was to be paid on the different tracts within fifteen months ; and whoever did not pay their purchase money, forfeited their shares of the lands survey-ed, which might be granted over to others. In this case, no mo-ney was tendered to the Receiver General, nor patent demanded from the secretary of the land office. The proof is express and direct, that Reuben Haines, in February or March 1774, as agent and on behalf of ensign Morrow, tendered to the Board of Officers in Philadelphia the money for patenting the land in dispute, which was refused by the officers. This tender is wholly inoperative, having been made to the wrong persons, and above fifteen months after the lands were allotted finally to captain Kern.

SHIPPEN, C. J. The court are called upon to try this cause on the demurrer to evidence. I will give my sentiments on the title in a few words : I think of it now as I thought when the event happened.

Governor John Penn, for whom I had a high respect, was greatly irritated at ensign Morrow, who was strongly suspected of aiding the rescue of the persons, charged with murdering the friendly Indians on Middle Creek. But I thought him wrong in the present matter. The Board of Property had granted a favour to the officers, including Morrow, in granting them a special li-*68] *cence to take up lands, in three large bodies before the office opened. A contract was formed thereby and en-tered in the books of the land office, which the proprietaries could not rescind. Though the officers had the first choice, they were bound to pay the usual price for the lands ; and after the concessions were once made, it was too late to retract the licence. The special circumstances under which the grant was made, do not seem to create any distinction between it and a location or warrant, except that on the latter the money would be paid down ; and it is clear to me, that the officers at Harris's Ferry had no right to impose the terms of Morrow's clearing himself from the charge, before he should be admitted to a share. It is admitted on all hands that he paid 16s., his quota of expences, and this tract was drawn as his lot in the lottery. A difficulty has been stated, that he has not paid his purchase money, nor tendered it to the proper persons within the proper time : but this in my

idea, does not invalidate the first grant; and on the whole, I think the defendants' title the best.

SMITH, J.　I agree to the opinion delivered, though with great diffidence.　The difficulty which strikes me, is, that under the terms of purchase, whoever failed in complying therewith, forfeited his share, and the lands might then be granted to others. This seems to distinguish it from the common modes of granting lands by warrant or location, in which there are no such clauses. It is like a legacy given on a condition in restraint of marriage, with a devise over: such subsequent conditions will have their full effect, and cannot be got over.　4 Burr. 2055.

BRACKENRIDGE, J.　On the merits of the case, I clearly agree the title to be in the defendants.

Demurrer overruled, and judgment for the defendants.

Referred to in 5 Binn. 152.
Cited in 2 S. & R. 187 where the court says that the law with respect to demurrers to evidence, was well considered in the case of Ross v. Eason.
Cited in 8 Pa. 96 in support of the proposition that the law is well settled that every fact stated is to be taken as true against the person demurring.